**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| TRENT DAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | **AND RECOMMENDATION** |
| ADVANCE STORES COMPANY, | ) | |
| INC., | ) | 1:07-CV-726 |
| | ) | |
| Defendant. | ) | |

This matter is before the court on a motion for summary judgment by Defendant Advance Stores Company, Inc. (docket no. 15).  Plaintiff has responded in opposition to the motion, and the matter is ripe for disposition.  Furthermore, the parties have not consented to the jurisdiction of the magistrate judge, so the motion must be addressed by way of recommendation.  For the following reasons, it will be recommended that Defendant's motion for summary judgment be granted.

BACKGROUND

This case involves claims of race discrimination in employment under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e.  Plaintiff Trent Day brings claims against his current employer Defendant Advance Stores Company, Inc. ("Defendant" or "Advance").  Plaintiff originally filed a charge with the Equal Employment Opportunity Commission ("EEOC") on February 20, 2007, alleging race discrimination and retaliation.  (Appendix 3 to Def.'s Br. Supp. Mot. Summ. J.)  On May 30, 2007, the EEOC issued a finding of no probable cause and notice of right

to sue. (Appendix 4 to Def.'s Br. Supp. Mot. Summ. J.) Plaintiff filed this lawsuit against Defendant in Guilford County Superior Court on August 27, 2007. Defendant timely removed the Complaint to this court on September 28, 2007.

UNDISPUTED FACTS

Plaintiff is an African-American (black) male who has been employed by Defendant since October 2004. Defendant hired Plaintiff as a part-time salesperson assigned to one of its stores in Graham, North Carolina. Plaintiff's manager at the time of hiring and throughout the first couple of years was Randy Lambert. (*Id.* p. 116.) Plaintiff testified that he never had any problems or race-related concerns while Lambert was his manager. (*Id.* p. 118.) On one occasion, a customer came into the store while Plaintiff was working and exclaimed, "No spics and no niggers should be working here." (*Id.*) Plaintiff ordered the customer to leave the store, and, when he did not, Plaintiff called the police. Afterwards, Manager Lambert complimented Plaintiff on how he handled the matter, saying, "You handled it very well." (*Id.* p. 119.)

Plaintiff was promoted to full-time salesperson in February 2005, and he was further promoted into a management position as Second Assistant Manager in July 2006. (*Id.* pp. 124-25.) Bryce Morgan was the Manager at the Graham store at the time of Plaintiff's promotion and made the decision to promote him. (*Id.* p. 124.) Plaintiff testified that he does not believe that he was ever passed over for promotion. (*Id.* pp. 126-27.) Plaintiff further testified that he had no race-related

-2-

issues or problems with Morgan or fellow employees at the Graham store until Thursday, February 8, 2007. (*Id.* pp. 127-30.)

The February 8, 2007, incident, which is the sole incident of racial discrimination alleged in the February 2007 EEOC Charge, arose out of a dispute regarding a part that Plaintiff previously ordered for a customer. (*Id.* pp. 131-33.) The customer returned the part and apparently blamed Plaintiff for selling him an incorrect part. When Plaintiff tried to explain to him what caused the error, the customer stated, "I ain't got time to hear that. Just ring me up, dumb ass nigger." (*Id.* p. 136.) Plaintiff refused to serve the customer. Another salesperson waited on the customer, who then left the store. (*Id.* p. 137.)

A short time later, Plaintiff's manager Morgan came to the office in an angry mood because the customer had apparently asked for the number to Defendant's corporate office to complain that Plaintiff had refused him service. (*Id.* pp. 137-39, 180-81.) When Morgan asked Plaintiff to explain what happened, Plaintiff replied simply that he had refused service to the customer. Plaintiff did not tell Morgan that the customer had called Plaintiff a "dumb ass nigger." (*Id.* p. 141.) Plaintiff testified that he never told Morgan at any time, either immediately after the incident or at any time since, that the customer used a racial slur towards Plaintiff. (*Id.* p. 182.) Plaintiff testified that the outcome would have been different if Plaintiff had told Morgan about the racial name:

Q: Do you think the outcome would have been different if you had told [Morgan], "Hey, man, this guy called me a pretty nasty racial name"?
A. I think the outcome would have been different, yeah.

(*Id.* p. 186.)

After Plaintiff refused service to the customer, Morgan told him to hand in his keys and clock out, telling him he was terminated. (*Id.* p. 141.) Plaintiff left the store and immediately called the Division Manager Jimmy Wright, who is Morgan's immediate supervisor, and the Regional Human Resources Manager, Alan Maxwell. Plaintiff was unable to reach Wright, but he did reach Maxwell, who assured Plaintiff that he would investigate the situation. (*Id.* pp. 142-43, 146-47.) Plaintiff stated that the first time he told anyone about the customer using a racial slur was in the phone call with Maxwell and "that's when [he] got right on it and got the ball rolling." (*Id.* p. 182.)

According to Plaintiff, Maxwell immediately began to investigate the matter and "seemed . . . kind of upset about what happened, and he didn't approve of it from the tone of his voice." (*Id.* p. 183.) Later that day, Wright telephoned Plaintiff and set up a meeting for the following Monday with Wright and Maxwell. (*Id.* pp. 147-48.) Plaintiff believed the meeting would resolve the situation and allow him to air any concerns he had regarding Morgan. (*Id.* pp. 148-49.) Plaintiff agreed not to return to work until after the Monday meeting. (*Id.* pp. 174-75.)

Even though Plaintiff had agreed not to return to work until after the Monday meeting, Plaintiff went to the Graham store the next morning (a Friday). His wife

-4-

went with him.  While at the store, Plaintiff confronted Morgan, who reminded Plaintiff that he was not supposed to report to work until after the meeting with Maxwell and Wright.  At some point, Plaintiff's wife became upset and began screaming at Morgan, calling him a "racist."  (*Id.* pp. 154-55.)  Morgan ordered Plaintiff and his wife to leave the store.  When they initially refused to leave, Morgan threatened to call the police.  (*Id.* pp. 155-56.)

At the meeting with Maxwell and Wright the following Monday, Plaintiff raised a series of complaints regarding Morgan and Plaintiff's prior manager Lambert. None of these complaints had to do with Plaintiff's race.  Rather, Plaintiff testified that he believes that Morgan has animosity towards him because Plaintiff is friends with a former employee of Defendant, Bert Wilke, whom Plaintiff believes once had a sexual affair with Morgan's wife.  (*Id.* pp. 143-46, 149-50.)  Plaintiff also complained to Wright and Maxwell that Morgan had accused Lambert of stealing parts from the company for his personal vehicle, and that Morgan believed Lambert was a "suck ass" in his dealings with Wright.  (*Id.* pp. 158-62.)

During the meeting, both Wright and Maxwell clearly explained to Plaintiff that he had not been terminated and that they would investigate the incident further.  (*Id.* p. 165.)  Toward the end of the meeting, the parties agreed that Plaintiff would begin working for Advance at its store on Church Street in Burlington rather than at the Graham store.  (*Id.* p. 166.)  The Church Street store is about 3.5 miles farther from Plaintiff's house than the Graham store.  (*Id.* pp. 167-68.)  Plaintiff did not tell

-5-

Maxwell or Wright that he did not want to work at the Church Street store or that it was too far from his house to travel. (*Id.* p. 168.)

Plaintiff testified in his deposition that neither his race nor his complaint about the customer who directed a racial slur towards him resulted in the transfer to the other store:

> Q. So at the end of the meeting, when you left, what was your understanding of your employment relationship with Advance?
> A. That I had my job back, thanks to those two guys, mainly Alan, in my opinion.
> Q. Your job back at the Graham store?
> A. No, sir, at the South Church Street facility. And I still don't know to this day why I couldn't work–I could work with anybody, but he didn't want me back. Bryce didn't want me back, and the only thing I can think of is because he didn't want to see Bert, the man that had had sex with his wife on occasions. I wouldn't want to look at nobody that–I wouldn't, just being a man, being honest, I wouldn't want to see him, either.
> Q. Okay. So you think Bryce [Morgan] didn't want you back because of your relationship with Bert?
> A. Yeah, and Bert hasn't been back to that facility since. I was the only person that he would come to see.

(*Id.* pp. 166-67.) In response to a specific question as to whether Morgan acted against him because of his race, Plaintiff stated, "I believe maybe it was more because of a relationship between Bert and I." (*Id.* p. 233.)

The day after the meeting with Maxwell and Wright, Plaintiff telephoned Wright and requested a personal leave of absence unrelated to the incident at the Graham store. (*Id.* p. 169.) Defendant granted the leave, and 30 days later Plaintiff returned to work at the Church Street store. Upon his transfer to Church Street, Plaintiff

-6-

remained a Second Assistant Manager, with the same pay and hours. Other than the change in location, Plaintiff's work remained the same. (*Id.* p. 176.) Plaintiff's Store Manager was Andrew Young, with whom Plaintiff got along well and had no issues of a racial nature. (*Id.* pp. 64, 67, 170.) Plaintiff further testified that he had no issues with any employees because of his race while Young was the manager. (*Id.* p. 67.) Finally, Plaintiff testified in his deposition that after Plaintiff's report of the February 8 incident to Wright and Maxwell, Defendant had a managers' meeting, during which Advance reinforced its policy of terminating relationships with customers who direct racial slurs to employees. (*Id.* pp. 119-20.)

Two incidents involving customers occurred while Plaintiff was working at the Church Street store. The first involved a situation in which Plaintiff was outside the store and a passerby in an automobile hollered a racial slur at him. (*Id.* p. 60.) Plaintiff believes that the person yelling the racial slur was also the same person who had called him a "dumb ass nigger" at the Graham store. (*Id.* p. 61.) Young told Plaintiff that if they figured out who it was, Defendant would "fire the customer." (*Id.* p. 170.)

The second incident occurred inside the store when Plaintiff overheard two white customers saying, "Look at that dumb nigger." (*Id.* p. 63.) Plaintiff did not confront the customers but, instead, reported the incident to Young within a couple of minutes. (*Id.* p. 64.) Young became upset and immediately went to look for the customers, asking other employees where they had gone or if anybody knew them.

(*Id.* pp. 170-71.) Plaintiff believes Young did so because he intended to ban the customers from the store. (*Id.*) Plaintiff testified that Young was very sympathetic when both of the above incidents occurred and "would show genuine emotions about how he felt about it, and he wouldn't have tolerated it, and he doesn't tolerate that type of behavior. He would rather fire the customer than fire the employee." (*Id.* p. 60.)

Finally, Plaintiff also testified in his deposition about certain events that occurred in September 2007 and later–after this lawsuit was filed–when Joseph Johnson replaced Young as Store Manager at Church Street. For instance, Plaintiff testified in his deposition that in October 2007 he found a corded noose in his locker at work. (*Id.* pp. 51-52, 74-75, located as Ex. to Pl.'s Resp.) The corded noose had Plaintiff's name on it and said, "Nigger die." (*Id.* p. 74.) Plaintiff did not tell anyone at work about the corded noose, and he first informed Defendant about the corded noose at a mediation conference held in February 2008. (*See id.* p. 81; *see also* Def.'s Br. p. 4.)

Plaintiff filed a second charge with the EEOC on November 2, 2007. (EEOC Charge No. 435-2008-00109, Day Ex. 7.) In the EEOC Charge filed on November 2, 2007, Plaintiff alleges the following:

> I have been employed with Advance Auto Parts since October 2004. I currently work at the above location. In the past, I filed a charge of employment discrimination with the EEOC against the company. Subsequent to filing the charge of discrimination, my hours have been reduced. Subsequent to Joseph Johnson becoming

-8-

Manager of the above location, he has been nitpicking me regarding store operating procedures and has been hostile toward me. I consider his actions to be harassment. I asked him to train me on how he wanted things to be done. He said he didn't have time. I requested to be demoted. In order to avoid being terminated, I felt forced to self-demote from Second Assistant Manager to the position of Salesperson. Subsequent to my self-demotion, my pay was cut. I am required to close the store more and to perform more closing duties than any of the other employees in my store. I am the only Black employee in the above store.

Even though my hours have been reduced, several employees have been hired to work in this store. All of them are White. Some of them are part-time and receive more hours than I. I am a full-time employee. There were several qualified Black applicants for these positions, but none of them were hired. I am aware of White employees who self-demoted, but their pay was not cut.

I believe that I have been discriminated against in violation of Title VII of the Civil Rights Act of 1964, as amended, due to my race (Black) and in retaliation for having filed a charge of discrimination with the EEOC against the company.

I also believe that the company discriminates against Blacks in hiring, in violation of Title VII of the Civil Rights Act of 1964, as amended.

(Appendix 5 to Def.'s Br. Supp. Mot. Summ. J.) According to the parties, the

November 2, 2007, charge remains pending at the EEOC, and no notice of right to

sue has been issued.

STANDARD OF REVIEW

Summary judgment is appropriate when there exists no genuine issue of

material fact and the moving party is entitled to judgment as a matter of law. FED.

R. CIV. P. 56(c); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir.

-9-

1997). The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting). When making the summary judgment determination the court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997).

DISCUSSION

Exhaustion of Administrative Remedies under Title VII as to Plaintiff's Claim for Hostile Work Environment

In this lawsuit, Plaintiff alleges both discrimination and hostile work environment. Plaintiff's complaint alleges "hostile treatment" by *both* employees and

-10-

customers and that "conduct of Defendant's supervisors was responsible for creating an intimidating, hostile, and offensive work environment." (Compl. ¶ 5.) Plaintiff alleges that he "has complained about racially hostile treatment by employees and customers of the Defendant" and that he "also notified management of Defendant regarding his concerns that Caucasian employees were given special treatment as a direct result of their race." (Compl. ¶ 4.)

Although Plaintiff's complaint does not contain factual allegations supporting his claim for hostile work environment, Plaintiff testified in his deposition about several events that purportedly support his claim for hostile work environment. First, Plaintiff testified about an incident that occurred sometime before he filed the EEOC charge, in which a customer in the store stated in front of Plaintiff that "spics" and "niggers" should not be allowed to work at the store. (Day pp. 118-19.) According to Plaintiff, he made the customer leave the store and afterwards Plaintiff's then-manager told Plaintiff that he had done the right thing. Next, Plaintiff testified about the one incident that was mentioned in his February 2007 EEOC charge in which a customer called him a "dumb ass nigger" in February 2007. (Day p. 136.)

Plaintiff also testified in his deposition as to several events that occurred *after* he filed the February 2007 EEOC charge. For instance, Plaintiff described two additional incidents involving racial slurs made by non-employees of Defendant. In one incident, a passerby in a car yelled a racial slur to Plaintiff while Plaintiff was at work. In the other incident, two white male customers who were in Defendant's store

used a racial slur in referring to Plaintiff.  Finally, Plaintiff also testified in his deposition that in Fall 2007, long after he filed the EEOC charge in February 2007, he found a corded noose in his locker at work.  (Day pp. 51-52, 74.)  He stated that the corded noose had his name on it and that it said, "Nigger die."  Plaintiff stated in his deposition that he never told anyone at work about the noose and he does not know who put the noose in his locker.  Defendant contends that Plaintiff has failed to exhaust his administrative remedies with regard to his hostile work environment claim.  For the following reasons, I agree.

The timely filing of a charge of discrimination and exhaustion of administrative remedies at the EEOC is a prerequisite to filing an action under Title VII.  *See* 42 U.S.C. § 2000e-5(b), (e)(1), (f)(1); 29 C.F.R. § 1601.28.  Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit.  *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996).  Therefore, a plaintiff fails to exhaust his administrative remedies where his administrative charges reference different time frames, actors, and discriminatory conduct from the central factual allegations in his judicial complaint.  *Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir. 2005).

Plaintiff's EEOC Charge, filed on February 20, 2007, stated in full:

I was employed by the above company in October 2004 and was subsequently promoted to the position of Second Assistant Manager. On February 8, 2007, a customer referred to me as a "dumb ass

-12-

Nigger." Due to the treatment I received from the customer, I refused to wait on the customer and politely referred him to another Associate for assistance. I informed the General Manager of the incident and he discharged me. After complaining to the Area Supervisor and the Human Resources Manager I was rehired, but I was transferred to a location in Burlington, which is a further distance from where I live. I did not request to be transferred to the store in Burlington.

The General Manager informed me that I was discharged because I cussed the customer. I did not cuss the customer and there are witnesses who can verify this. The Human Resources Manager informed me that in the future, I may be transferred back to the store in Graham.

I believe that I have been discriminated against in violation of Title VII of the Civil Rights Act of 1964, as amended, due to my race (Black) and in retaliation for complaining about the discriminatory treatment to which I was subjected.

(Appendix 3 to Def.'s Br. Supp. Mot. Summ. J.)

Plaintiff's EEOC Charge alleges a single act of racial harassment by a customer on February 8, 2007, and retaliation by Defendant when it allegedly terminated or transferred Plaintiff for reporting the incident. The discrimination is alleged to have occurred between February 2 and 14, 2007, and the box for "continuing action" is not checked. (*Id.*) In the body of the Charge, where the "particulars" are set forth, there is no allegation that anyone other than a single customer ever directed racial slurs at Plaintiff. Nor is there any allegation that Plaintiff was treated more harshly than white employees because of his race. The only allegations regarding a "supervisor" relate to Plaintiff's General Manager Morgan, who allegedly discharged him after Plaintiff reported the incident, and to the

-13-

Area Supervisor Wright and Human Resources Manager Maxwell, who subsequently assured Plaintiff that he was not going to be fired.

Thus, the only allegations in the complaint that are even arguably encompassed by Plaintiff's February 2007 EEOC Charge are that he was "temporarily" terminated in February 2007 and that Defendant began to retaliate against Plaintiff by transferring him to another store farther from his home rather than correcting the discriminatory conduct of his manager. (*See id.* ¶¶ 3, 6.) Therefore, Plaintiff has failed to exhaust his administrative remedies to the extent that the complaint alleges harassment by co-workers or supervisors or the creation of a hostile work environment by them. Moreover, although Plaintiff testified in his deposition about two additional occurrences in which customers apparently used racial slurs against Plaintiff, these two additional occurrences were beyond the period of February 2-14 as specified in the EEOC Charge. The EEOC Charge filed in February 2007 contains no such allegation of harassment or other racially hostile treatment. Likewise, the EEOC Charge does not contain any references regarding special treatment given to white employees. In sum, Plaintiff has not exhausted his administrative remedies with respect to his claim for hostile work environment.[1]

---

[1] Because I find that Plaintiff has not exhausted his administrative remedies with respect to the hostile work environment claim, there is no need to address Defendant's alternative contention that Plaintiff's hostile work environment claim is not sufficient as a matter of law to survive summary judgment.

-14-

<u>Acts of Discrimination Based on "Temporary" Firing and Relocating of Plaintiff to</u>

<u>Another Store</u>

I next consider Plaintiff's claims of Title VII discrimination based on his race.

Title VII makes it unlawful for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1). To satisfy ordinary principles of proof in discrimination cases, a plaintiff must provide direct evidence of a purpose to discriminate or circumstantial evidence of sufficiently probative force to raise a genuine issue of material fact. *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988). Because it is often difficult for a plaintiff to provide direct evidence of discriminatory intent, the Supreme Court has created a burden-shifting structure for analyzing such claims. *See McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Under this burden-shifting structure, known as the "McDonnell Douglas" framework, the plaintiff must plead facts sufficient to create an inference that an adverse employment decision was based on impermissible considerations. This may be done by showing that (1) the plaintiff is a member of a protected class; (2) the plaintiff was otherwise qualified for the position; (3) the plaintiff suffered an adverse employment action; and (4) the action took place under conditions establishing an inference of discrimination. *See id.* at 802.

Once a plaintiff establishes a prima facie case, the burden then shifts to the defendant to demonstrate a legitimate, nondiscriminatory reason for the challenged action. *Id.* If the employer demonstrates a legitimate, nondiscriminatory reason, the presumption of unlawful discrimination created by the prima facie case "drops out of the picture," and the burden shifts back to the employee to show that the given reason was merely a pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 57-58 (4th Cir. 1995). The responsibility of proving that "the protected trait . . . actually motivated the employer's decision" remains with the plaintiff at all times. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). To overcome a motion for summary judgment in such a case, a plaintiff must provide direct or circumstantial evidence "of sufficient probative force" to show a genuine issue of material fact exists as to this question. *Goldberg*, 836 F.2d at 848. With these principles in mind, the court now turns to Plaintiff's discrimination claims.

Plaintiff alleges two discrete acts of alleged "discrimination." The first act of "discrimination" was Morgan's temporary firing of Plaintiff. Since it is undisputed that Plaintiff was not ultimately fired, Morgan's "temporary" firing of Plaintiff did not constitute an adverse employment action. In any event, even if the temporary firing of Plaintiff were considered an adverse employment action, Plaintiff has admitted that when Morgan "fired" Plaintiff, Morgan did not know about the racial slur made

-16-

by the customer.[2]  (Day pp. 141, 182.)  All Morgan knew was that Plaintiff had refused to serve a customer, which is a legitimate, non-discriminatory reason for firing Plaintiff.  Furthermore, Plaintiff admitted that the outcome would have been different if he had told Morgan about the customer's use of the racial slur.  (*Id.* p. 186.)  Plaintiff also admitted that as soon as he made the other manager Maxwell aware of the situation, Maxwell acted within minutes to look into the matter, and he set up a meeting for the following Monday.  (*Id.* pp. 182-83.)  At the meeting, Plaintiff was assured that he had not been terminated and he was given the opportunity to voice his complaints.  Therefore, even if Plaintiff could prove his prima facie case, Defendant has come forward with a legitimate, non-discriminatory reason for the alleged adverse employment action, and Plaintiff fails to show that the reason was a pretext for discrimination.

As for Plaintiff's claim that he was discriminated against by being transferred to another store after the incident with the customer, I first note that it is doubtful that

---

[2] Plaintiff's brief opposing summary judgment is replete with generalized allegations of discrimination, with very few particularized, supporting facts.  Moreover, to the extent the brief contains factual assertions, many of these factual assertions plainly contradict Plaintiff's own deposition testimony.  For instance, although Plaintiff clearly admits in his deposition that he *never* told Bryce Morgan that the customer had called Plaintiff a "dumb ass nigger," *see* Day p. 182, lines 9-10, Plaintiff's brief portrays Morgan as being fully aware that the customer had called Plaintiff a "dumb ass nigger" and that Morgan proceeded to fire Plaintiff despite this knowledge.  Plaintiff's brief opposing summary judgment also argues in a conclusory fashion that "[e]xamples of racial animosity went beyond the customer [who called Plaintiff a 'dumb ass nigger'] and included Plaintiff's relationship with an *African American* ex-employee who had a relationship with [Plaintiff's] supervisor's wife."  (Pl.'s Br. Opp. Summ. J. at 2) (emphasis added).)  In fact, the ex-employee who allegedly had an affair with Plaintiff's supervisor's wife was a *white* man, according to Plaintiff's own deposition testimony.  (*See* Day p. 150, lines 11-12.)

the transfer constituted an adverse employment action within the meaning of Title VII. The Supreme Court has explained that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998). Furthermore, the Fourth Circuit has observed that for a job transfer to be considered an adverse employment action, the plaintiff must show that the reassignment had a "significant detrimental effect" on her.[3] *Boone v. Goldin,* 178 F.3d 253, 256 (4th Cir. 1999). Thus, a mere change in an employee's job assignment, even if "less appealing to the employee, . . . does not constitute adverse employment action." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004).

Here, after the transfer to the new store, Plaintiff was in the same position, with the same pay rate, performing the same duties, and the only additional burden that Plaintiff has identified is that the new store was about 3.5 miles farther from his house than the old store. (Day p. 176.) Moreover, Plaintiff testified in his deposition that he got along well with his first manager Young at the new store. In any event, even if the transfer to the new store was considered an adverse employment action,

---

[3] The *Boone* court further stated that "absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." *Id.* at 256-57.

Plaintiff has not shown that he was transferred to another store because of his race or for refusing to serve a customer who used a racial slur against Plaintiff. When asked specifically whether he believed that he was transferred to another store because of his race, Plaintiff stated that race was not a factor. (Day p. 233.) Plaintiff explained that his supervisor Morgan did not want to work with Plaintiff anymore because Plaintiff was friends with an ex-employee (Bert), who purportedly had an affair with Morgan's wife. Plaintiff's admission that race was not a factor in Morgan's desire to have Plaintiff move to the Church Street store negates any attempted causal link between Plaintiff's race and his transfer to another store. In other words, even if Plaintiff could establish a prima facie case of discrimination, Defendant has produced a legitimate, non-discriminatory reason for transferring Plaintiff away from the Graham store–because Plaintiff and Morgan had personal issues not related to race–and Plaintiff agrees that this was indeed the reason for the transfer.

In sum, for the reasons stated above, summary judgment is appropriate as to Plaintiff's claims of race discrimination arising out of his "temporary" firing and his transfer to another store.

Retaliation for Reporting Racial Harassment by a Customer

I next consider Plaintiff's claims of retaliation. Plaintiff argues that Defendant retaliated against him for refusing to serve a customer who was calling him racial slurs by "temporarily" firing him and by transferring him to another store. To

-19-

establish a prima facie claim for retaliation, a Title VII plaintiff must produce evidence from which a reasonable jury could find that (1) he engaged in protected activity; (2) his employer took materially adverse action against him such that it could dissuade a reasonable worker from making or supporting a charge of discrimination or from otherwise engaging in another form of protected activity; and (3) a causal relationship existed between the protected activity and the materially adverse activity. *See Burlington N. & Sante Fe Ry. v. White*, 548 U.S. 53, 68 (2006); *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004).

The court will assume that Plaintiff engaged in protected activity when he refused to wait on a customer who used a racial slur against Plaintiff. Plaintiff has admitted, however, that he never reported to Morgan that he had been called a racial name before Morgan terminated his employment. Since Morgan did not know about the racial slur, there is no causal link between Plaintiff's alleged protected activity and the temporary termination of his employment. Moreover, it is undisputed that when Plaintiff talked to Maxwell and told him about the racial slur, Maxwell quickly responded and soon confirmed that Plaintiff was not going to be fired. (Day p. 165.) Therefore, as a matter of law, Plaintiff cannot show a prima facie retaliation claim based on the temporary firing of Plaintiff by Plaintiff's manager Morgan.

The next issue is whether Plaintiff states a prima facie claim of retaliation based on the fact that he was transferred to a different store after the incident with

the customer.[4]  Defendant contends that the move to another store was not a form of retaliation because it did not constitute an "adverse employment action." Defendant has misstated the proper burden in proving a retaliation claim.  The Supreme Court recently clarified the requirements for proving retaliation under Title VII in *Burlington Northern & Sante Fe Railway Co. v. White*.  In *Burlington Northern*, the Court held that to prove retaliation, a plaintiff need not show that the act of retaliation constituted an "ultimate employment decision" such as firing, non-promotion, etc. Rather, for an employer's acts to constitute actionable retaliation under Title VII, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination [or from otherwise engaging in protected activity].'"  548 U.S. at 68 (internal quotation omitted) (quoting *Rochon v. Gonzalez*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

Applying the *Burlington Northern* standard, Plaintiff has not established a prima facie claim of retaliation under Title VII.  That is, even assuming that the transfer to another store was a materially adverse action such that it could dissuade a reasonable worker from engaging in protected activity, Plaintiff has admitted that the transfer was not related to Plaintiff's refusal to serve the customer who called

---

[4]  Plaintiff does not and cannot claim that he was transferred to another store in retaliation for filing the February 20, 2007, EEOC charge because, by his own account, he was transferred to another store *before* filing the February 20 EEOC charge.

-21-

him a racial slur, but to other personal issues between Plaintiff and Morgan. Therefore, Plaintiff cannot establish a causal link between his protected activity and the transfer to another store, and he has failed to establish a prima facie claim of retaliation.[5]

Claims of Retaliation for Filing the February 2007 EEOC Charge

Next, Plaintiff also contends in this lawsuit that Defendant retaliated against him in various ways for filing the February 2007 EEOC Charge. Plaintiff mentions additional events that occurred after he filed his EEOC Charge to support his claim of retaliation, and he asserts in his brief that the retaliation and hostile work environment is "ongoing." For instance, Plaintiff states that after he transferred to the new store, one of his managers, Joseph Johnson, refused to train him on specific methodologies used in the store and that Johnson acted in a "very hostile" manner towards Plaintiff. Plaintiff states that in an effort to reduce his work-related stress, he asked for a lower-level position. (Day pp. 99-100.) Plaintiff contends that in addition to the hostile working environment, he began to receive reduced hours, as well as schedules that provided for more weekend and night closing hours than performed by white employees, and that he is required to unload heavy trucks by himself. (*Id.* pp. 84-85; 204; 221-22; 239-41.) Plaintiff also asserts that in Fall 2007

---

[5] Since Plaintiff has not established a prima facie case for retaliation, the court need not shift the burden to Defendant to articulate a legitimate, non-discriminatory reason for the transfer to the other store. Indeed, both parties agree that Plaintiff was transferred because of his personal issues with Morgan and not because Plaintiff refused to serve a customer who called him a racial slur.

he found a small, corded noose in his locker at the store.[6] (*Id.* pp. 51-52.)  Plaintiff contends that despite his excellent work performance at the store, he continues to be treated differently from the white employees in the store.  (*Id.* pp. 51-52; 74-79; 221.)

Courts have consistently held that retaliation claims may be raised for the first time in federal court if the retaliation occurred after the filing of the administrative charge.  *See Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992); *see also Newby v. Whitman*, 340 F. Supp. 2d 637, 649 (M.D.N.C. 2004) (citing cases).  Nevertheless, as Defendant notes, all of these latter events are part of a second EEOC charge filed in November 2007, and which is still pending with the EEOC.  (*See* Appendix No. 5, Def.'s Br. Supp. Mot. Summ. J.)  As noted, in the second EEOC charge, Plaintiff specifically alleges that Defendant retaliated against him for filing the first EEOC Charge by, among other things, reducing his hours, refusing to train him appropriately, treating him differently from white employees, forcing him to take a "self-demotion," etc.  All of these allegations are covered by his retaliation claim in his second EEOC charge, and it is therefore not appropriate to address them here.

---

[6] Even though he filed a second EEOC charge of discrimination in November 2007, Plaintiff did not mention the noose incident in the EEOC charge.  Moreover, as already noted, he did not tell anyone about the alleged noose incident until a mediation conference held on February 14, 2008.

<u>CONCLUSION</u>

Accordingly, **IT IS RECOMMENDED** that Defendant's motion for summary judgment (docket no. 15) be **GRANTED** and that this action be dismissed with prejudice.

_____
WALLACE W. DIXON
United States Magistrate Judge

August 28, 2008